We received the motions on both Kott and Coring about the braiding material, and the court has those under advisement. Unless we ask specific questions, you need not discuss those today. Has the government seen the motions? Yes. All right. We may ask for some argument at the end on those, but we want to confine the initial presentations to the merits of the appeal. I think they built this for me. May it please the court, Cheryl Gordon-McLeod on behalf of Pete Kott. We briefed numerous issues in this case. My intent is to begin with the vouching issue, which I think is dispositive of all the convictions in this case, and then to go on to the Hobbs Act jury instruction claim, which the court asked for discussion on. And if there's still time to get to the courtroom closure issue, I'm of to talk about. Let's start with vouching. Thank you, Your Honor. The question on the vouching issue is whether the opinions of high government agents and federal judges that there was enough evidence for wiretaps and bugs to be issued and reissued and then issued again amounts to impermissible vouching. I think that following United States v. Brooks, this court's decision, the answer is easy. The answer is yes. Extensive testimony about the process of authorizing and reauthorizing wiretaps amounts to impermissible vouching. And that's precisely what we had in this case. Agent Dunphy was one of the government's first witnesses at the trial, and the government elicited from him on direct examination that he believed that there was wrongdoing in this case. Counsel, here the original targets were not your defendant. Is that correct? Correct. The original targets, according to one line in the testimony at the trial, were Mr. Smith and Mr. Allen. In Agent Dunphy's testimony, we have to look at what was told to the jury, though, and I'm referring here primarily to pages 191 to 199 of the excerpts of record. The first eight pages of that is Agent Dunphy talking in general about wrongdoing without specifying Allen, Smith, or Cott, just in general about the wrongdoing that was going on here. Then he mentions that it was Allen and Smith that were originally targeted, and then he says that it was suite 604 in 191. Then he goes on to say the investigation then expanded over time, and he specifically says, I believe it's ER 213, that he came to recognize Cott's voice on the tapes as well. He said he recognized Allen's voice and face from the video. He recognized Smith's, and then he specifically said he came to recognize Cott. So unlike the Bustamante case from the Seventh Circuit, which the government is relying on, in which the testimony was clear that somebody other than the defendant was the person targeted, here, the first ten pages of Dunphy's testimony were mushy. He didn't say anybody. He then went on to say Allen, Smith, and 604, and then he went on to say, but the investigation expanded, and I did recognize Cott's face and voice on the tapes. Now, if we were to agree with you that this was vouching and was error, then we have to look as to whether it was harmless in the broader context. They certainly got Cott's on the record asking for money. There were certainly audiotapes and videotapes in this case. The case is not as open and shut, though, as the government's briefs make it out to be, though, and the clearest evidence of that is that the jury actually acquitted on the honest services wire fraud count. So it's not like the jury agreed with everything that the government was presenting to them. As for the tapes, there were certainly statements on there that the government could and did argue were highly incriminating, particularly the I've sold my soul to the devil and you've got a job, now get us a pipeline statements, and the government certainly argued that those were the gospel truth and the devil was Mr. Allen and they were talking about a quid pro quo, an exchange. The defense, however, had a different argument. The defense argued the tapes were full of crude language, bravado, bragging, but the defense continued and this was supported by Mr. Cott's own testimony. Mr. Cott, Mr. Allen and Mr. Smith shared a common view. They believed that the PPT 20 legislation was the best thing for the development of the oil production industry in Alaska and hence was the best thing for the people of Alaska. This was an uncommon view in Alaska or in the House of Representatives. The government argued its version. The defense argued its version. As I said, the jury acquitted completely on one count and the government acknowledged that the tapes themselves weren't dispositive on this issue. How did they acknowledge that? By calling Allen and Smith to testify at trial and not relying solely on the tapes. By bolstering Allen's testimony, by having that closed hearing where they sought to bar impeachment of Allen on critical issues and by arguing credibility. The government's rebuttal closing argument, beginning on the second paragraph of that closing argument, starts in on credibility. And finally, in the government's brief on this appeal at page 15, they say Allen's testimony, quote, alone supports, close quotes, the conviction. So certainly there was damaging stuff on the tapes. Government argued it one way. Defense argued it the other way. But both parties knew that this was a credibility case and the acquittal shows that it was a close credibility case. Going back to the question of vouching as error, one of the difficulties I have is balancing the need for the government to provide foundation for the introduction of the tapes and the excess foundation, if you will, that constitutes vouching. How do we balance those and what do you think the government is entitled to put on in terms of foundation evidence in this kind of case? Well, I hear your question. You can't just say, here are the tapes. Well, I hear your question. Let me answer first by saying it's not a question in this case, because in this case there was a stipulation. Clerk's Record 167, which we have in the ER at starting at page 76. Right. I take your point on that. But in the broader sense, how much foundation, because it may affect how we approach this analytically, how much foundation is the government entitled to put on absent the stipulation? Well, as long as we're on the same page, that there was authentication, identification, foundation, objections were waived in this case. I think Cunningham, the service of the case, is the one that discusses that and says that in order to lay a foundation for the admissibility, you don't have to lay the foundation that the Title III wiretap was legal. It's foundation as it is for a book or a tape of some other kind. Do you recognize the speaker? How do you recognize it? How could you tell? Those sorts of preliminary questions rather than anything about the lawfulness of the Title III wiretap or the bug in the first place, because the lawfulness of it or whether somebody else has approved it is not an element of foundation, just as whether a judge has issued a search warrant is not something that you have to prove before you admit the smoking gun into evidence. We found the gun and it was in the car and it was under the seat. You don't say, and a judge gave us a warrant because he thought this guy was really guilty. So I would say they're akin to each other. I'd like to get to the court's question on the quid pro quo instruction. And the question here is whether the government has to prove a quid pro quo for a Hobbs Act extortion conviction under color of official right and whether the jury instruction in this case, jury instruction 15, effectively eviscerated that element of the crime. Again, there's pretty much a single controlling case, which this panel has directed us to, the Kincaid-Chauncey case, and it provides a clear answer. Quid pro quo is an element of the crime. It's not just an element, as McCormick said, for campaign donations. It's also an element for non-campaign donations. So that covers every one of the exchanges alleged in this case, or not alleged but submitted to the jury anyway. What I did was sort of a compare and contrast with the Kincaid jury instruction and the jury instruction that was given in our case. And the first four elements were pretty much the same. One, public official. Two, money, taking money to which he's not entitled. Three, in return for taking some official action, and granted that in return for sounds a lot like quid pro quo. Four, affected commerce. Then the instructions in paragraph that says basically no explicit promise is necessary. Quote, rather it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular influence. And then Kincaid goes on to say that this adequately states the quid pro quo element because, quote, you get something and you get something else. So like I said, the first four elements in our case were pretty much the same, but it didn't have those concluding paragraphs. Instead, the concluding paragraph in Mr. Cott's case said, quote, the government does not have to prove that the official actually took or intended to take that action, or that the official would not have taken the same action, even without receipt of the property, close quote. I find this concluding paragraph unique. I haven't found it in any of the other Hobbs Act quid pro quo cases that I looked at. It seems to me that it's the opposite of the quote, you get something and you give something, quote, that Kincaid Chauncey set as a standard. Instead, it seems to be you get something and you don't have to give something. So it's eliminating the bargain for exchange element, and that was a key issue in this case. Mr. Cott took the stand, and he testified about his close relationship over the years with Bill Allen. He explained how they called him Uncle Bill, how he was a friend of the family, and how in times of need Mr. Allen had helped the family out with different things. Bill Allen confirmed the relationship that he had between himself and Pete Cott's family. The government argued, the government took full advantage of this in its closing argument. At ER 322, they argued that the defendant, quote, doesn't even actually have to take an official act in order to be guilty, close quotes. So whether there was a bargain for exchange was critical here. Now, I think jury instruction 15 completely eviscerated this element. If the panel... Instruction 15, again, you're talking about the last paragraph? Correct, on page ER 124. Even if that element 3, the in return 4, does have a quid pro quo ring to it, that last paragraph contradicts it. And the cases that I found, particularly U.S. v. Mendoza in the opening brief, says that if the jury instructions are contradictory on whether the jury must find a particular element... Why is it contradictory? It confirms, right, that the property was received in return for official action. So that part confirms the earlier instruction, right? Doesn't it? The government does not have to prove that the official actually took or intended... Oh, before that. Oh, the two paragraphs before that? No, no, no. First clause. No, the clause before that. The government must prove that the official received the property in return for official action. Yes. That confirms the first part of the instruction. Yes. So you're saying now that the next clause contradicts it? Yes, from the government does not have to prove until would not have taken the same action even without receipt of the property. Why was that contradicted? Because it makes it that you could take the money without giving anything in return. No, it means, you know, even though you received the money in return for official action, it's still a crime even if you don't take that action. Is that what it says? I don't think so. Let's look at the portion after the comma. Or that the official would not have taken the same action even without receipt of the property. That was kind of Pete Cott's defense. He supported the PPT legislation in 2020. It was his testimony. He said he thought that was best for the state of Alaska. He said that he had agreement in principle with Mr. Allen and Mr. Smith over it and that he would have voted for it no matter what. So if you take everything after that last comma, which is I read as an alternative to the first portion before the comma, it says he's guilty if he would have voted for PPT 2020 even without receipt of the property. So there was no bargain for exchange. Yes, it is. It's an odd wording to be sure. But I suppose alternately you could say, well, he was bribed once and then people decided to pay him a whole bunch more times. They had already agreed to do it and therefore it's a defense to the subsequent bribes. That's another way to consider it conceptually. Yeah. Or taking a bribe from five different people for taking the same action. I'm thinking that that's a little bit higher level of conceptualization than this instruction really gives to the jury. I'm thinking that on the one hand it says bargain for exchange and on the other hand it says not really. He could have taken it just as a reward for doing something he already would have done. But what this clause really speaks to is the government's burden of proof and it says that the government doesn't have to prove that the official would not have taken the action, right? Before the comma, yes. That's what it says. After the comma. Well, after the comma it says, or that the official would not have taken the same action even without receipt of the property. And all this says is that the government does not have to prove that negative. Correct. It just has to prove the affirmative, which is that the defendant knew that the property was given in return for his agreement. Your Honor, the latter part of what you just said is not found after the comma and as it took us a couple of seconds... No, I was going back to the earlier part of the instruction. You're right, it's not found after the comma, but isn't that a sensible reading of that instruction? Forgive me for answering that question with a question, but isn't mine a sensible reading of that instruction also? And given the standard in Mendoza, that if it's potentially contradictory... All this paragraph says is, or this part of the paragraph says, is what the government does not have to prove. Correct. And it doesn't have to prove a negative, right? Once it proves what's required by the third element of the instruction, it doesn't have to go on and prove the negative, which is set forth in this last clause. And if you believe that that is the natural import of that instruction on reading it, I lose. I win if the natural import of that instruction, or a contradictory, or if that clause makes it potentially contradictory. You're saying it's reasonable and natural for the jury to read that phrase as contradicting the earlier part of the instruction? I say that, yes, particularly because the government argued it that way. At ER 322, they said the government, quote, doesn't even actually have to prove, that defendant doesn't even actually have to take an official act to be guilty. And I think that that was exploiting that portion of the instruction. Or is that 322? ER 322. I'd like to take about 42 or 41 seconds to make a comment about the courtroom closure in this case, which occurred at the beginning of trial. And I guess to sum that up as briefly as possible, this was closure at the court's own initiative for a pretrial hearing on whether very politically charged and sensitive information could be used against Mr. Allen, and whether that violated the right to an open courtroom. The government's position seems to be that the right to an open courtroom doesn't apply to stuff outside the trial. And as we've shown with Brooklier, Press Enterprise, Waller, Seattle Times, it certainly does. It applies to pretrial hearings, it applies to guilty pleas, it applies to suppression motions. But didn't you waive that argument? Your Honor, I think it's more accurate to say that, first of all, this is structural error. Second of all, if Olano applies, and we're talking about plain error review, it's more accurate to say that it was forfeit rather than waived. And the reason is this. I went back and reread Olano to see what the objections were like there, next to the objections or lack of objections in our case. And they were pretty much identical. In Olano, at first, before the 14th juror went back, the judge said she was planning to send the 14th juror back, and asked defense counsel what they said, and a couple of them said they object, and then she said, well, revisit it the next day. And then on the last day, one lawyer, apparently speaking for all of them, said, it's okay, it's okay. You can send the other two jurors back to the courtroom. The U.S. Supreme Court characterized that as plain error, forfeit, not waived, despite the fact that the lawyer got up and said, it's okay with us, didn't go into a deep discussion about whether you have to ask the defendant about it personally, in part because there was government acquiescence in the fact that it was forfeit rather than waived. And I believe we have the same situation here, including government acquiescence in forfeiture rather than waiver. I believe that the beginning of their courtroom closure argument starts with, this is subject to plain error review. It's not plain error because it wasn't error, but a concession that plain error review applies, which it wouldn't if the error had been waived. Let's assume we agree with you on your courtroom closure argument. Why isn't that satisfied by a direction to release a transcript? Well that might satisfy the First Amendment issue, which we're not raising, but it doesn't satisfy the Sixth Amendment issue, which is the only issue that we can raise. After the fact, release of transcripts certainly wasn't the solution in Waller v. Georgia. No, they sent it back down for further proceedings on what to close and so forth. I realize I have a different remedy in Waller, but most of the other cases you decide are press cases and they're dealing with the First Amendment, not the Sixth. If we assume it's not structural error, why wouldn't a release of the transcript satisfy the Alano factors? Well, if we assume it's not, I don't think you can assume it's not structural error. You can assume that plain error. No, I'm assuming for the sake of argument, it's not structural error. How does it satisfy the Alano factors? Are you saying that if it's not structural error, you lose? No. If we apply Alano, error in terms of courtroom closure, I say plain under Brooklyer, Press Enterprise, and Waller. Next question is were substantial rights affected? I submitted a supplemental authority yesterday, U.S. v. RACIO, which talks about how structural error interplays with Inquiry No. 3, the Substantial Rights Inquiry under Alano, and it says that if it's an error that's characterized as structural, which courtroom closure is under Arizona v. Fulminante, then it automatically, in the Ninth Circuit, it automatically satisfy the substantial rights inquiry. Okay, but you get to Factor 4? Factor 4 seriously affects the fairness, integrity, or public reputation of the proceedings. Right, so why doesn't a release of transcript satisfy Factor 4 under Alano? The proceedings were closed during the course of the trial. Let me refer you to the Phoenix newspaper case, this court's ... Yes, I'm familiar with it. Oh, that's right. I wrote it. That's right. Well, good. Then we release the transcript. Then you have memory better than I do, and you know that in that case, you talked about whether public access plays a significant role in establishing the integrity of the proceedings. So we had an event during the trial that occurred that was closed and was satisfied later by release of transcripts. It was a First Amendment case. It was the newspapers. It wasn't a Sixth Amendment right at issue. You can't go back. Release of transcript doesn't satisfy the openness that Mr. Cotton needs. It might have satisfied the openness that the press needed if they would have said something. Right. Thank you, Counsel. Thank you, Your Honor. We'll give you a few minutes for rebuttal. We took over your time with our questions. Hear from the government? Mr. Koski? Good morning. May it please the Court. Would you move the microphone up just a bit so we can hear you? And you can adjust the podium there. Okay. I'll just adjust the microphone. May it please the Court. My name is Peter Koski, and I represent the United States. This case is about a corrupt public official, Pete Cott, who was the former speaker of the Alaska House of Representatives and a leader among elected officials. According to his own words, Cott had to cheat, steal, beg, borrow, and lie, and was willing to sell his soul to the devil. He did this in order to pass legislation favorable to a company whose two principals had agreed to give him cash, checks, and a promise of a future lucrative job with the company. Defendant Cott has raised seven issues on appeal, and I would like to devote my argument to the same three issues that Defendant Cott addressed. First, the voucher issue. Second, the Hobbs Act instructions in light of Kincaid Chauncey. And then, if there's time, the closed hearing. Agent Dunphy's testimony about the procedure for obtaining a Title III does not constitute impermissible vouching. And in the alternative, even if it does, any error is harmless because there is substantial independent evidence of Defendant Cott's guilt. I don't even understand the purpose of that type of testimony, aside from its prejudicial effect. What's the purpose of eliciting that kind of testimony anyway? I realize you want to trial a lawyer, but why would you do that? The purpose, I think, as was implicit in Judge Thomas's question to Attorney for Defendant Cott, is to lay some foundation for the introduction of the foundation. The foundation was stipulated. Well, the foundation was stipulated. The admissibility was not. And this also helps to overcome that sort of awkward presentation to the jury of just saying, here are the tapes, now we're going to play them. It's helpful to provide some background testimony to the jury for the tapes that they're going to hear. I think it's more appropriate. But this went on and on. This wasn't just, we obtained the necessary approval, we instituted the wiretaps. This goes into great length about the care and the process. And I think I have to agree with Judge Tashima, the only purpose seemed to be to prejudice the case. It went on, I believe, there were 23 trial transcript pages. That's a lot to lay foundation. But as Judge Sedgwick found, this background testimony was of a generalized nature, and I think it really glorifies it to characterize this testimony as vouching testimony. And not only was this of a generalized nature, but as soon as Agent Dunphy began to discuss the targets of the investigation, he mentioned two names, Bill Allen and Rick Smith. He did not mention Pete Cott. I went through the- Until a little bit later. Until the very end. I went through- We took extreme care to all these people. I want to convince you how this process works, and we have to convince everybody up the chain that these people are guilty. And by the way, this guy was guilty too, and that's why we continued the wiretaps. Isn't that the necessary implication of what happened here? I don't think that's a fair characterization of the testimony. I went through the 23 pages, and I counted the number of times that Agent Dunphy mentioned the names Rick Smith or Bill Allen. He mentioned those two names 23 times. He mentioned Pete Cott's name only once, and that was at the very end of the testimony- Punchline. Yes. It was not a punchline. The question- I mean, it's in the sense of a joke punchline, but that was leading up to the final conclusion. We took all this care, and we got this guy. I think this actually goes back to more directly addressing Judge Tashima's first question, which is, why do you have this type of testimony? And the reason he mentioned Pete Cott's name was in response to the question, did you come to recognize his voice? And that's helpful for the jury, because he was about to play these 56 audio and visual tapes in which Pete Cott is talking. And so it's helpful to explain to the jury that this agent became familiar with his voice. Without all that preamble and all that verification stuff, the question simply could have been, did you recognize Cott's voice on the tapes? End of story. It could have been. And maybe in the future with the government, it will be. Maybe it will be, Judge Fletcher. But I think in this case, even this additional foundational testimony did not amount to impermissible vouching. I think the key fact here- Well, Mr. Koska, you must get the impression that this panel is not real friendly to your argument that it wasn't vouching, but you do have a fallback position, right? That even if it is considered to be vouching, it was not harmful. That's correct, Judge Tashima. And that was a position of this circuit in the Brooks case, in which the Ninth Circuit found that the foundational testimony did amount to impermissible vouching, and yet the Ninth Circuit affirmed the convictions below because the court found that there was substantial independent evidence of the defendant's guilt. We recognize Brooks came out after the trial in this case, so neither party had advantage of it at the time. But yes, they did found vouching in that case. It was a defendant case, as you point out. So what is the harmless error analysis in Brooks and how do you address it to this case? I think the distinction, I think what especially distinguishes this case from Brooks and Cunningham and puts it more in the camp of Bustamante is that in Brooks and Cunningham, the target of the surveillance was the defendant, whereas in this case, the target of the surveillance, the target of the Title III was someone other than the defendant. And that makes it more consistent with the facts in Bustamante. And as the court said in Brooks, once we get to that harmless error analysis, to ascertain whether the vouching amounts to plain error, the court balances the seriousness of the vouching against the effectiveness of any curative instruction and the closeness of the case. And in this case, the tapes really speak for themselves. It wasn't just one tape. It wasn't even just a few tapes. There were 56 audio and video tapes in which the defendant was taking money, the defendant was soliciting future employment, a lucrative job with the company. The defendant said that he had to lie, cheat, and steal, that he was willing to sell his soul to the devil in order to assist with the passage of this legislation that was favorable to the company. So even if this court finds that there was impermissible vouching contained in Agent Dunphy's testimony, I think the only conclusion, particularly in light of Brooks, is that any error was harmless because of the substantial independent evidence of the defendant caught to guilt. The second issue I would like to go to is the Hobbs Act jury instructions and the impact of Kincaid-Chauncey. The district court's jury instructions here were sufficient to satisfy the quid pro quo element of Hobbs Act extortion under color of official right. The analysis doesn't end once we determine that Kincaid-Chauncey extended the quid pro quo requirement beyond campaign contributions for extortion under color of official right. We then had to look to the jury instructions as the attorney for defendant Cotted and as this panel was doing during that exchange. I agree with counsel for defendant Cott that that third instruction, the third element in jury instruction 15 satisfies the quid pro quo element and counsel for defendant Cott conceded that on not only in her oral argument but on page 22 of defendant Cott's reply brief. The instruction in Kincaid-Chauncey was the defendant knew that the money was given in return for taking some official action and the instruction here was the defendant knew that the property was given in return for his agreement or understanding whether explicit or implicit for taking some official action. Now the issue then becomes whether or not this last instruction below in jury instruction 15 somehow undermines that third element in jury instruction 15 which even counsel for defendant Cott concedes satisfies the quid pro quo element. The government submits that this last portion of instruction 15 is entirely consistent with the Supreme Court's holding in Evans and is actually consistent with the jury instruction in Kincaid-Chauncey. The instruction at issue here in defendant Cott's case reads as follows. While the government must prove that the official received the property in return for official action, the government does not have to prove that the official actually took or intended to take that action or that the official would not have taken the same action even without the receipt of the property. In Kincaid-Chauncey the additional instruction read as follows. The government does not have to prove an explicit promise to perform a particular act made at the time of the payment. Rather it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence as specific opportunities arise. Now the defendant Cott's position especially interpreting the last clause of the instruction below would mean that a public official such as defendant Cott could say that the PPT legislation is good for Alaska so I'm going to make it good for me. And I'm going to vote for that legislation but I'm also going to approach every company and wealthy individual who's going to benefit from that legislation and solicit money in exchange for my vote even though I'm going to vote for it anyways. That is the type of position that defendant Cott is asking this court to adopt. Now the language in this last instruction is in fact consistent with the Supreme Court's holding in Evans and it's consistent with the Ninth Circuit's holding in Tucker in which this circuit said that the government need not show an explicit agreement between Tucker and McCartykin. The government need only show that Tucker received the payment knowing that it was made in return for official acts. So the crime of extortion ends once that payment is accepted and the public official understands that he received that money and was not entitled to it meaning that he received it and it was an official act or some promise to take some official act. But it is not an element the government does not have to establish under Hobbs Act extortion under color of official right that the public official then went on to take that official act. What about Ms. McLeod's argument centering on the very last phrase of instruction 15 which says that the government does not have to prove that the official action would not have been taken, no the official would not have taken the same action even without receiving the money. It is a little confusing isn't it? It may be a little confusing on first glance but that clause of the instruction is not only consistent with evidence and other controlling case law on Hobbs Act extortion under color of official right but that clause is actually necessary and the reason that clause is necessary goes back to my first argument meaning that without that clause a defendant would be able to claim that he is innocent because that legislation is good for example for the state of Alaska. Well why does the first if you put the period, eliminate the while and put the period where the comma is at the first clause doesn't that say it all? Government has to prove that the official received the property in return for official action period. That's your case. The problem is though that by then adding those clauses he says the government doesn't have to show that would not have taken the same action even without receiving the property. Now that was the entire defense. But those last clauses don't undermine the quid pro quo element contained in that first sentence in that first clause and the reason is because as I said it precludes a public official from claiming that he is innocent for accepting money, taking official acts. It precludes him from saying that he is innocent because the official acts that he took were good for his constituents. It prevents for example defendant caught in this situation to say that he is innocent because the PPT legislation was good for Alaska. Because then you get into litigation over whether or not an official act actually is good for the constituents and it also undermines the important thing is here it undermines the integrity of the process. The Hobbs Act extortion under color of official right is not just concerned with the results it's concerned with the integrity of the process and when you have public officials who are not just willing but are soliciting the acceptance of payments, who are soliciting future lucrative employment from individuals who are going to benefit from their official acts what this On the other hand let's say it's just a legitimate campaign contribution and the official takes action consonant with probably what the contributor wanted but the official is going to take that action anyway. Under your reading that's a Hobbs Act violation. That's right and there's a there's well there's a quid on here I mean this is just somebody who's he said look let's say that Mr. Codd or just put Mr. X is well known supporter of the oil and gas industry it's not uncommon for those kind of officials to get contributions for the oil and gas industry. That doesn't make it a Hobbs Act violation. Well it does if the public official says to the payor to I mean that's the first the first the first clause covers that. What you're what you're asking I think is for us to expand Hobbs Act liability quite considerably. I don't think the last clause of the instruction expands Hobbs Act liability I think it's entirely consistent with the Hobbs Act cases that have come before and even in a concept it does go beyond the instruction in those approved in Kincaid-Chauncey. Nothing like that in Kincaid-Chauncey right? I think it's similar to that portion of the instruction in Kincaid-Chauncey that I read earlier which says the government does not have to prove and this is at Penn site 937 of Kincaid-Chauncey the government does not have to prove an explicit promise to perform a particular act made at the time of the payment rather it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence as specific opportunities arise so the language is not exact. But this no but this goes a little further than that this is that the government doesn't have to prove you take any action at all or that the and then that if action is taken for other reasons it's not a defense basically. Well part of it's a wording putting it all together in one sentence and perhaps one mashing it all together in terms of what the government has to prove and doesn't have to prove but it is and it seems to be an extension. I agree that it could be a little clearer but I disagree that it's an extension of Hobbs Act extortion under color official right because extortion here is not concerned with the official act it's concerned with the public official either agreeing to take an official act in exchange for the receipt of property or accepting property with the understanding that that property is given to him only because he is expected to take some official act. Now the government I'm not aware of any Hobbs Act extortion under color official right cases which have required the government to prove that the official then went on to take some act either voting on legislation or any other kind of official act which is why I think that this last clause in the instruction is entirely consistent and not only do I think it's consistent and that it does not undermine the quid pro quo element which I read earlier but I think it's necessary. I think it's necessary for the reason that I just stated because Hobbs Act extortion does not require the government to prove that an official actually took an act because once the public official receives that money and he receives it with the understanding that it was given to him with the expectation that he was going to take some official act that's the crime of extortion. Whether he takes that act later or not or whether he was going to take it for some other reason because he thinks it was in the best interest of his constituents is not relevant to a Hobbs Act analysis because the crime would have been committed once he received that property. Do you want to get to courtroom closure? Yes Judge Thomas thank you. Briefly with respect to courtroom closure the first argument is that defendant Cott affirmatively waived this and this issue is not properly before the Ninth Circuit. This is not just an issue where defendant Cott failed to object. This was an issue where the court actually gave defendant Cott an opportunity to express his position on the courtroom closure and defendant Cott affirmatively said that he had no objection to the courtroom closure. I think the analysis should end there but in the alternative if this court looks to a plain error analysis the courtroom closure did not affect defendant Cott's Sixth Amendment right to a public trial. The reason is because the hearing lasted just under an hour. No testimony was taken. It involved a motion in limine and was limited to a legal argument. It involved sensitive ongoing criminal investigations and the defendant does not challenge the district court's ruling that was made within that closed hearing. Does that make a difference? I think it makes a difference with respect to defendant Cott's argument that this was structural error that somehow transcended the integrity of the criminal process from beginning to end. The fact that defendant Cott consented to the closed hearing did not object to the court's ruling that was made. That's a different argument. Leaving that aside, why wouldn't a Sixth Amendment right attach to this proceeding? Judge Thomas, I see that I've gone beyond my time and I'm happy to continue answering. The reason why is because I'm not aware of any Supreme Court case or any circuit case which has extended a defendant's Sixth Amendment right to a public trial to a motion in limine in which no witness testimony has been taken. What's the analytical difference between this and Waller? Just witness testimony? No, I think the difference is that in Waller, Waller involved a seven-day suppression hearing and the court in Waller described a suppression hearing in general and that suppression hearing in particular as a mini-trial. The reason for the court's closure in Waller is because it did not want to publicize the plain of audio tapes which consisted of only two and a half hours of that seven-day suppression hearing. This case here is more, this closed hearing is more analogous to a sidebar conference and I'm not aware of any case which has extended a defendant's Sixth Amendment right to a public trial to a sidebar conference, for example. So I think that this closed hearing is distinguishable from Waller, is distinguishable from any other Sixth Amendment right to a public trial case. And again, I think first defendant caught affirmatively waived this issue and even if the court gets to this issue, the closed hearing did not affect defendant caught's right to a public trial. Any further questions? No. Thank you, counsel. Thank you. We'll give you two minutes for rebuttal. Thank you, Your Honor. I know you have a lot to say, but you're very succinct. I think I'll be brief. Oops. I think I'll be brief. With regard to the quid pro quo issue, the government argued that that final clause was necessary to prevent against the evil that he was talking about of sort of going around and getting money as a reward for something you were going to do anyway. I think the answer to that is in jury instruction number 16 on the bribery charge. I think that's what bribery criminalizes and it even talks about taking the money as a reward, which is different from the Hobbs Act violation. So even if the Hobbs Act doesn't cover that, there's something that covers it. With regard to vouching, the government argued that in Brooks and Cunningham, the target was the defendant and that's the big difference. Actually, in Brooks and Cunningham, as well as in Bustamante, the court consistently uses the word inference. What was the inference, the natural inference to be drawn from the agent's testimony? And in those cases, the inference was that the target was the defendant and in Bustamante the inference is that the target was somebody other than the defendant. The inference in this case, of course, with Cott being named as somebody that they were listening to, the inference is that Cott was among the targets. Unless there's other questions. Thank you, Counsel. Thank you, Your Honor. And I know you'll stick around for the next argument. We may ask the government a few questions about the motion following conclusion of that argument. So if you might be prepared to offer any comments at that time. Thank you, Your Honor. The case is here to be submitted. We'll hear argument in the next case on the calendar, which is United States v. Coring.
judges: Fletcher B. , Tashima, Thomas